MOORE–McCORMACK LINES, INC., Petitioner-Appellant,

v.

ARMCO STEEL CORPORATION, Wessel, Duval & Co., Inc., et al., Claimants-Appellees.

MOORE–McCORMACK LINES, INC., Cross-Libellant-Appellant,

v.

Luisa V. WALL, as administratrix of the goods, etc., of Edward T. Wall, deceased, Respondent-Appellee.

MOORE–McCORMACK LINES, INC., Cross-Libellant-Appellant,

v.

Jean O. RICHARDSON, as executrix under the last will and testament of Harold R. Richardson, deceased, Respondent-Appellee.

Petition of MOORE–McCORMACK LINES, INC., as owner of THE Steamship MORMACKITE, for exoneration from or limitation of liability.

No. 69, Docket 25329.

United States Court of Appeals Second Circuit.

Argued Oct. 16, 1959.

Decided Nov. 30, 1959.

Rehearing Denied Dec. 31, 1959.

874

Eugene Underwood, New York City, for appellant.

Burlingham, Hupper & Kennedy, New York City, for petitioner-cross-libellant-

appellant Moore-McCormack Lines, Inc., Hervey C. Allen, Robert A. Feltner, Richard C. Hatch, New York City, of counsel.

Henry N. Longley, New York City, for appellees.

Bigham, Englar, Jones & Houston, Bernard Rolnick, Joseph Friedberg, Cooper, Ostrin & De Varco, William L. Standard, Shafter & Shafter, New York City, for claimants, John J. Martin, Robert H. Kilroe, Herbert J. De Varco, Louis R. Harolds, Jack Steinman, New York City, of counsel.

Before CLARK and HAND, Circuit Judges and SMITH, District Judge.

HAND, Circuit Judge.

The Moore-McCormack Lines, Inc., the owner of the steamer, "Mormackite," appeals from a judgment of the District Court denying its petition for exoneration from, or limitation of, liability for the loss of life and cargo when its vessel, the "Mormackite," sank off Cape Hatteras on the morning of October 7, 1954 with the loss of her cargo of iron ore and a parcel of cocoa beans, together with that of 37 of the ship's company, including her master, chief mate and chief engineer. The survivors, 11 members of the crew, the personal representatives of the estates of those lost, and the owners of the cargo filed claims against Moore-McCormack Lines, Inc., and that company filed cross-libels against the master, chief mate and chief engineer of the ship for negligent navigation. After a long trial Judge McGohey granted judgment against the owner without limitation in favor of the survivors, the personal representatives of those lost, and the cargo claimants, and dismissed the cross-libels. The issues in the case are whether the stowage of the "Mormackite" was seaworthy, whether her navigation preceding the loss was proper, and whether, if the stowage was unseaworthy, the owner may limit its liability for either the cargo or loss of life under § 183(a) of Title 46 U.S.C.

The findings are that the ship had been laden at Vitoria, Brazil, which port she left on September 25th, and "proceeded without untoward incident" until on October 7th "shortly after 4 a.m. heavy seas struck the vessel's starboard side, rolling her very hard to port about 20 to 25 degrees. The ore shifted. * * * The vessel took a port list. Her speed was reduced at once," and shortly thereafter the list was so far corrected she had only a little list to port. "Heavier seas were still coming from starboard. Some time after 8:30 there was another very violent roll to port. The ore shifted heavily again. * * * The shifting continued. The vessel took a severe port list. * * * The list increased steadily. Chief Officer Richardson and Chief Engineer Wall were then seen attaching fire hoses to the sounding pipes leading to the starboard deep tanks." "At or after 8:30 the speed had increased"; and at about the time of the violent roll "the speed indicator * * * registered 'full speed.'" "However, 'the next telegraph order from the bridge' was 'full stop; * * * every moment it was changing.'" The master on the bridge was "ordering 'right wheel amidships—he was trying to right the ship.'" "At 8:30 the vessel still had a port list which resulted from the first shift of cargo at 4 o'clock. And, despite the fact that she had been on reduced speed since 4 o'clock, she was nevertheless rolling hard. And the seas hitting her starboard were heavier than before. It is obvious that, in order to avoid a further shift of the ore a change of course was necessary. It is clear that this is just what Captain McMahon was trying to do." He may have been "trying to put her about and thus cause some of the ore to shift away from port to starboard." "The cargo pumps were put into operation after the 8:30 list."

██ Upon these findings McGohey, J., found that the stowage was unseaworthy. It is not clear whether he would have so found, had there been

no evidence as to the stowage itself; but upon that highly disputed issue he found that "the ore was stowed as indicated on the stowage plan, Claimant's Exhibit 4: that is, the ore in No. 1 lower hold was piled up through the hatch into No. 1 lower 'tweendeck; in No. 3 and 5 lower 'tweendecks the ore was piled up through the hatches into the upper 'tweendecks." He also found by inference which we accept, that the master knew how the ore was stowed when the ship broke ground. If his conclusions were not "clearly erroneous," it would follow that for the personal injuries and deaths of the ship's company the petitioner was liable without limitation. § 183(e) Title 46 U.S.C.

The seaworthiness of the stowage depended first upon how it was put on board at Vitoria and whether that was in accordance with proper maritime practice. As has already appeared, the finding was that the ore was deposited in piles whose tops extended through the hatches in three instances. The ore had lain in piles ashore, near where the ship lay, from which it was dumped upon a "conveyor belt" which moved perpendicular to the ship's side. This "belt" carried a "chute" which could be manipulated so as to discharge ore at varying angles into any of the hatches. The claimants argue that without hand trimming this necessarily resulted in stowing the ore in conical heaps which were apt to shift as the ship rolled. The ship answered that the chutes could deliver the ore at an angle and fill the hold, or 'tweendeck, so as to reach its sides and bulkheads in heaps not conical and therefore not likely to shift. Furthermore she put in evidence that the practice had been common at Vitoria to stow ore in this way, and that only in one instance had a cargo shifted that had been similarly stowed. Her expert witness, Wilson, testified that this method was safe. Moreover, although four or five of the survivors swore that the ore in the holds had lain in heaps and had extended through the hatches, some of these had stated

upon examination by the Coast Guard they had not observed such stowage of the ore.

We do not think that the evidence was such as would permit our disturbing the judge's finding on the facts. That the survivors' testimony was inconsistent was of course to be considered; but it was not conclusive, especially since the judge had seen the witnesses. Again we cannot say that the judge should have accepted the opinions of the ship's experts in preference to that of Manning, the claimants' expert who condemned the stow. The outstanding fact is that in seasonable weather the ore did shift and in the end capsized the ship. As McGohey, J., put it, the "inference is inescapable, I think, that she was unseaworthy as to her stowage." [164 F.Supp. 206.] When to this we add the almost inevitable conclusion that when she broke ground her master must have seen the stow, the denial of limitation follows; or at any rate we should not be warranted in holding that the findings were "clearly erroneous."

 Other considerations apply to the claims of the cargo. A shipowner may limit his liability for cargo loss under § 183(a) of Title 46 only in case he proves that the loss was "without" his "privity or knowledge." In the case at bar the owner was a corporation, and it must be owned that it is hard to say from the books who are the officers whose "privity or knowledge" will charge the corporation, except that they must apparently be "the managing officers" (Craig v. Continental Insurance Co., 141 U.S. 638, 646, 12 S.Ct. 97, 99, 35 L.Ed. 886), whatever that may mean. In the case at bar it appears to be common ground that only notice to the following four of the corporation's officers would deprive it of its right to limit: Furey, Chief of Operations, Mayo, Marine Superintendent, Barrett, Assistant Marine Superintendent, and O'Brien, Operations Manager. It does not appear that Claimants' Exhibit 4 came to the notice of any of these men before the ship broke ground

at Vitoria. Nor do we think that the evidence would have justified a finding, if the judge had made one (which he did not), that the practice of stowing ore, as the "Mormackite" was stowed, had become so uniform as to charge these officers with knowledge; or that they, or at any rate Barrett, must have known that it had been so stowed. We do not say that there can never be such "negligence" of a "managing officer" of a corporation as will establish "privity or knowledge" of the owner under § 183(a); indeed we have said otherwise, Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2 Cir., 159 F.2d 661, 664, but in the case at bar Moore-McCormack Lines, Inc., had issued regulations, among which one (OV 34c II), provided that the "usual chuting of ore into a vessel which results in a conical pile may be acceptable practice for specially constructed ore-carriers, but can cause considerable damage to vessels constructed to carry general cargo." Another regulation (OV 34c III), provided: "We have had vessels where the ore was stowed in single conical piles * * * and some of these ships have made passages without damage; with others the top of the cone has rolled down * * * and in one case has given a list which required the Master to put into Halifax to re-trim his ship." As was obviously necessary in foreign ports, it was left to those in charge to follow these directions, and if they failed, their failure did not charge the owner with "privity or knowledge." The situation was clearly within La Bourgogne, 210 U.S. 95, 126, 28 S.Ct. 664, 675, 52 L.Ed. 973: "The petitioner having shown the promulgation of regulations for the conduct of its business, which exacted compliance by the captains of its vessels with the international rules, we think the burden of proving * * * a wilful departure from their requirements was indulged in * * * was cast upon the claimants."

Indeed, McGohey, J., did not charge the owner as to the cargo with privity or knowledge that it had been ill-stowed, but based his decision upon a finding that the "stabilogauge" used in stowing the ship had not been properly "calibrated." A "stabilogauge" is an instrument carried on cargo ships to determine their "stability"; that is to say, to determine how much cargo they may safely carry and where it should be stowed. It has to be properly "calibrated" to the ship that is to be stowed: that is, it must be adjusted to the different carrying compartments and to the "free surface correction for tanks." One of the factors entering into the computation is the "light ship weight" and another is the "vertical center of gravity." [164 F.Supp. 207.] The computation itself is exceedingly complicated. It does not appear that, when the ship was built and delivered to the government there was a "stabilogauge" on board, or, if so, how it was "calibrated." At that time her "light ship weight" was in fact 5,328 tons. Barrett, the Assistant Marine Superintendent, in 1948 chose the "Mormackite" as a "key ship" of several ships (C2SB1s) for which to compute the stability, all being of one model. His computations were based upon a "stabilogauge" which had been delivered to Pier 32 of the stevedoring department, although the trial record does not show that this "stabilogauge" had ever been put on board the ship. Barrett computed the actual "light ship weight" of the ship in 1948 by adding to, and subtracting from, her "light ship weight" when built (5,328 tons), any changes made thereafter. His figure of 4,661 tons as her "light ship weight" in 1948 was correct. He then computed that in order to make the 1948 "stabilogauge" a reliable test of proper stowage all that was needed was to add to her cargo, as stowed, a supposititious 110 tons of "deck load."

Judge McGohey found that the record did not show that the ship carried a properly "calibrated" "stabilogauge," and that she was unseaworthy for that reason. He held that it was "possible

and even probable" (that) "the stabilogauge which the petitioner furnished for the use of Captain McMahon and Chief Officer Richardson on the Mormackite was calibrated to her original light ship weight of 5,328 tons and K G of 25.82 ft., they were sure to be misled in planning the stowage." [164 F.Supp. 211.] This presupposes that some "stabilogauge" had been put on board the ship; and that accords with every probability. However, even assuming that there was a "stabilogauge" that had been put on in 1945 before Moore-McCormack Lines, Inc. bought her and that it had been "calibrated" to a "light ship weight" of 5,328 tons, which nowhere appears, we can say with certainty that that was not the "stabilogauge" that was on the ship in 1954. This follows from a deposition of one, Kristal, which was not in record before Judge McGohey for reasons that will appear immediately. Kristal was the president of a company that made "stabilogauges" and he testified that on August 8, 1947, he had shipped to Moore-McCormack Lines, Inc., a "stabilogauge" "calibrated" for the "Mormackite" with a "light ship weight" of 4,490 and a vertical center of gravity of 27.6 feet. It appears to us that it would be altogether unreasonable to suppose that this was not the "stabilogauge" that was later on board in 1948, whose "calibration" Barrett accepted after the supposititious increase in its recorded tonnage of 110 tons deck load. Barrett's computation of "light ship weight" in 1948 being concededly correct, with this added increase in cargo the "stabilogauge" was reliable, and the ship *pro tanto* seaworthy.

■ Kristal's deposition had been taken before the trial had ended, but the Moore-McCormack Lines, Inc. did not offer it in evidence until after the judge had filed his opinion. Perceiving the importance that the "stabilogauge" had assumed, the owner then offered it in evidence. Judge McGohey refused to receive it, and after the appeal had been taken the owner moved in this court to have it added to the record

on appeal. This motion we denied, adding, however, the following comment: "appellant may of course argue as to the claimed effect of the excluded evidence in presenting its appeal." We accept this as equivalent to treating the deposition as part of the record, reserving, however, to the claimants the privilege of contradicting it. The claimants in their brief have not suggested that they wish to do this, so that we understand that we are to decide the appeal as though the deposition were a part of the record. We conclude therefore that it now appears that the "Mormackite" was not unseaworthy so far as concerned her "stabilogauge."

■ It is not necessary to deal at length with the owner's argument that the disaster was caused by the bad navigation of the ship before the shift of cargo about 8:30 a.m. She was, as we have said, put at full speed for a time and the master attempted to change her course so that she should be out of the trough of the seas, or perhaps even to expose her port side to the seas. There was testimony that this was not permissible navigation in such an emergency, but there was also testimony the other way. It would be strange if there were any fixed methods that those in charge were bound to adopt. Moreover, the question was in any event one of fact, and we should not be warranted in holding it "clearly erroneous" for Judge McGohey to find that the ship's navigation was at fault.

Lastly, it is quite plain that Moore-McCormack Lines, Inc. did not warrant the stowage of the ship. The charter did indeed warrant that she was "tight, staunch and strong and in every way fitted for the voyage," but there was no warranty as to her stowage, especially on the return voyage. Moreover, the charter contained a provision that the bills of lading should be subject to the Carriage of Goods by Sea Act, and that provision would be ineffective unless there was a limitation of liability in the absence of privity or knowledge of the owner—§ 1308, Title 46.

After what we have already said, it is clear that the dismissal of the cross-libels against the chief mate and chief engineer was proper. The claim of the master's estate has been settled.

The judgment awarding unlimited damages for loss of life or personal injuries will be affirmed. The judgment awarding damages for loss of cargo will be affirmed, but with limited liability

On Petition for Rehearing.

PER CURIAM.

The petition of the Moore-McCormack Lines, Inc. for a hearing is denied, but the Line should file an answer to the petition of Armco Steel Corporation and others for rehearing on two questions: (1) whether the cause should be remanded to Judge McGohey to make a finding that Barrett warned the master of the amount to be "cranked" into the stabilo-gauge; and (2) whether the cause should be also remanded to take testimony and to make findings as to the truth of the facts stated in the deposition of Kristal.