DUFERCO S.A., Petitioner,

v.

OCEAN WIDE SHIPPING CORPORATION, and Canadian Forest Navigation: Company Ltd., Respondents and Cross–Petitioners.

No. 99CV2951.

United States District Court, S.D. New York.

April 7, 2000.

---

Robert P. Stein, Camhy, Karlinsky & Stein, L.L.P., New York City, for petitioner.

## *ORDER*

BERMAN, District Judge.

### I. INTRODUCTION

Petitioner Duferco S.A. moves for an order, pursuant to 9 U.S.C. §§ 10 and 12, vacating a Maritime Arbitration Award rendered on February 26, 1999 (the "Award"). Respondents Ocean Wide Shipping Corporation and Canadian Forest Navigation Company, Ltd. cross-move for an order, pursuant to 9 U.S.C. § 9, confirming the Award. The Award, which assesses damages resulting from improper stowage of cargo, was made by a panel of three arbitrators (the "Panel") from the Society of Maritime Arbitrators pursuant to an agreement dated August 11, 1995; one arbitrator dissented. **For the reasons set forth below, the motion to vacate the Award is denied and the cross-motion to confirm the Award is granted.**

### II. BACKGROUND

Respondent Ocean Wide Shipping Corporation ("Ocean Wide" or "Owner") is a corporation organized under the laws of Liberia with its principle place of business in Villach, Austria. At all relevant times, Ocean Wide was the owner of the vessel M/V PUNICA ("PUNICA" or the "Vessel").

Respondent Canadian Forest Navigation Company, Ltd. ("Canadian Forest") is a corporation organized under the laws of Canada with its principle place of business in Vancouver, Canada.

Petitioner Duferco S.A. ("Duferco" or "Charterer") is a corporation organized under the laws of the Channel Islands [1] with its principle place of business in Lugano, Switzerland.

Pursuant to a Time Charter Party Agreement [2] dated February 18, 1994 (the "Head Time Charter"), Ocean Wide, as Owner, time chartered the Vessel to Canadian Forest under an amended New York Produce Exchange ("NYPE") Time Charter.

On January 4, 1995, Canadian Forest chartered the Vessel to Trans Sea Transport, N.V. ("Trans Sea") under a NYPE Time Charter (the "Sub–Time Charter"), the terms of which were substantially similar to those contained in the Head Time Charter between Ocean Wide and Canadian Forest. (Award at 2–3.)

Trans Sea sub chartered the Vessel from Canadian Forest in order to fulfill a Gencon Voyage Charter [3] between Trans Sea and Duferco (the "Gencon Charter") for a cargo of steel slabs from Taranto, Italy to Sparrows Point, Maryland. (Award at 2.) There were a total of 15,462,-687 metric tons to be loaded, comprised of 716 slabs said to measure 9.652 meters long by 1.117 to 1.27 meters wide and .24 meters thick. The weight of each slab

---

1. The Channel Islands are a group of islands in the English Channel, off the northwest coast of France.

2. A time charter is a contract for the use of a boat for a specified amount of time. The owner retains all control over the navigation and management of the boat. The charterer directs the owner to the particular destination(s) the charterer wishes to visit. 8 Michael B. McCauley & Frank P. DeGiulio, *Benedict on Admiralty* § 9.02(C)(1)(b) (7th ed. revised 1998).

3. A voyage charter is a contract for the use of a boat for a specific voyage. There are no time constraints on the voyage, the only requirement being that the owner reach the destination chosen when the charter was executed within a reasonable time period. The vessel owner retains all control, navigation, and management of the boat. *Id.* § 9.02(C)(1)(a). The Gencon form is a type of voyage charter.

varied between 13,750 and 23,138 kg. (Award at 3.)

ILVA Laminati Piani S.p.A. ("ILVA"), a large steel exporter, was the shipper and stevedore hired by Duferco to load the cargo pursuant to the Gencon Charter. (Award at 3–4.) The vessel's Master, Captain Satish Kumar Sud ("Captain Sud" or the "Master"), had never carried steel slabs before. (Award at 4.) ILVA's cargo superintendent informed the Master that the stevedores would use a stowage method known as "California Block Stow," by which the steel slabs are loaded "fore and aft in free-standing stacks, dunnaged and shored, then secured with Signode strapping using the 'Olympic' lashing method."[4] (Award at 4.) The straps were to bind only the top few tiers in the outer stacks vertically, but the top slabs in all the stacks would be tied together horizontally. The Master was initially skeptical of the stowage plan and "suggested that the slabs be stowed athwartships[5] and out to the sloping sides of the hopper tanks." (Award at 4.) ILVA advised the Master that this would be impossible because the receivers of the cargo did not have cranes with sufficient capacity to handle the fork lifts, which would be necessary if this approach were employed. (Award at 4.)

Persuaded (by the cargo superintendent) that the California Block Stow method was widely used for steel slab cargoes and that ILVA was expert in its application, the Master accepted ILVA's stowage plan. (Award at 4.) The Chief Officer

perceived an acceptable ship stability based on ILVA's intended plan and the Master was given a letter that stated, among other things, that "[t]he [California Block Stow] system has proved much more safe and sound than the traditional use of wire lashing and wooden chock/structures...." (Award at 4–5.)

On January 5, 1995, the Vessel arrived at Taranto, Italy to receive Duferco's cargo of steel slabs. (Award at 3.) Loading began on January 6, 1995 and was completed on January 10, 1995. The lashing and securing was also completed on January 10, 1995, and the Vessel set sail that same day. (Award at 5.) Prior to the Vessel's departure, the Master was presented with, and signed, a form letter from ILVA (the "Form Letter"), (Award at 5.), which stated:

> This is to certify that the cargo laden onboard my vessel has been loaded, stowed, secured and lashed under my supervision and up to my complete satisfaction. The vessel is in all respects seaworthy and is ready to carry on her voyage.

During the early morning hours of January 13, 1995, the Chief Officer heard a loud noise coming from the direction of the No. 5 hold and the Vessel took a sudden list[6] of about 12 degrees. (Award at 5.) According to the log, the Vessel was rolling moderately. (Award at 5.) The Chief Officer immediately called the Master, who arrived on the bridge within five minutes and assumed command of the Vessel.

---

4. Signode is a company that makes a patented securing system utilizing steel strapping and metal clips, as opposed to wire rope and turnbuckles. The straps are tensioned and held fast with metal clips using a hydraulic device. (Award at 4, n.2.)

5. Reaching across the vessel from side to side. Richard J. Nikas, Nautical Glossary at 2, in 8 *Benedict on Admiralty* (7th ed. revised 1998).

6. Permanent or semi-permanent inclination of a ship to one side or the other as distinct from heel. Richard J. Nikas, Nautical Glossary at 21, in 8 *Benedict on Admiralty* (7th ed. revised 1998).

(Award at 6.) The ship's course was altered and speed was reduced to ease the Vessel's motion. (Award at 6.) The Chief Officer inspected the cargo spaces and discovered that the cargo stow in all five of the Vessel's holds had collapsed. (Award at 6.) After consulting with the Owner, the Master set a course for Cagliari, Sardinia as a port of refuge and Owner declared a general average.[7] (Award at 6.)

Canadian Forest continued to pay hire charges to Owner, believing it improper to make any deductions unless and until there was a finding of liability against Owner. (Award at 6.) Trans Sea, on the other hand, placed the Vessel offhire from the time of the casualty until the voyage resumed believing that it was proper to do so under Clause 15 of the time charter parties. (Award at 6.)

On January 14, 1995, at Cagliari, six surveyors, representing the Owner, cargo and hull underwriters, and the shippers inspected the Vessel and cargo. Each prepared a report, but all jointly agreed to the following statement, (Award at 6–7.), with respect to the cargo condition on arrival:

> The cargo stowed in no 1, 2, 3, 4 and 5 holds has sustained a general shifting to portside.
>
> Having considered that the ship, with such disposition of the cargo, can not proceed with the voyage they have concurred on necessity to handle the cargo restowing the same as due, fitting also side structures to contain the cargo, composed of one vertical stiffener and

one horizontal beam made up with double T shaped steel beams, which had not been previously fitted in Taranto.

On January 15, 1995, work began to remove and restow the cargo, and to weld steel brackets, in order to contain the cargo and prevent it from shifting. Apart from the steel brackets, the restowage plan was essentially the same as the one planned at Taranto. (Award at 7.)

On January 17, 1995, it was discovered that the stevedores had disregarded their instructions and wrongly increased the number of slabs in each stack in the No. 3 hold. The increase in the number of slabs created "an excessive load on the tanktops" and had to be undone. (Award at 7.) No. 3 hold was then restowed according to plan. Welding work at the other holds continued uninterrupted during the delay at No. 3, and the restowage was completed on February 8, 1995. (Award at 7.) The Vessel sailed shortly thereafter for Baltimore and both the voyage to Baltimore and the discharge of the cargo there were uneventful. (Award at 7.)

### The Arbitration Proceedings

In or about January 1995, "various arbitration proceedings were commenced to recover, *inter alia*, the costs of restowage at Cagliari, as well as the amount of hire that was claimed to be due and owing after the Owner's declaration of [g]eneral [a]verage during which the Vessel was off-hire." (Stein Aff. at 4.) The two time charters provided for arbitration before a tripartite

---

7. The concept of "general average" is an ancient one "based on the principle 'the loss for the common benefit which is incurred by one who partakes in a maritime venture should be shared ratably by all who participate in the venture.'" *Gemini Navigation, Inc. v. Phillip Bros. Div. of Minerals & Chemicals Philipp Corp.*, 499 F.2d 745, 746 n. 1 (2d Cir.1974) (quoting *Cia. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co.*, 274 F.Supp. 884, 891 (D.Md.1967)). The "central principle" of the law of general average is that "'(w)hat is given, or sacrificed, in time of danger, for the sake of all, is to be replaced by a general contribution on the part of all who have been thereby brought to safety.'" *Eagle Terminal Tankers, Inc. v. Insurance Co. of the U.S.S.R. (Ingosstrakh)*, 637 F.2d 890, 892 (2d Cir.1981) (citation omitted).

panel in New York. However, the Gencon Charter provided for arbitration in London, under U.K. law. (Award at 7.) Pursuant to a Consolidation Agreement, dated August 11, 1995, the parties agreed to consolidate all arbitration proceedings into one proceeding in New York under the Maritime Arbitration Rules of the Society of Maritime Arbitrators, Inc. (Award at 7.)

The arbitration proceeding consisted (essentially) of Owner and Duferco asserting claims against one another in accordance with the various charter agreements.[8] Owner denied any responsibility for the casualty and sought to recover the sum of $435,047.16, representing restowage costs (and certain other costs that were not reimbursed). (Award at 8.) Duferco denied any liability for the casualty and counterclaimed for $57,844.33, representing its general average contribution. (Award at 9.) Duferco contended that, in the event Owner were to prevail, any award to Owner should be reduced by the cost of restowage delays at Cagliari. Duferco also contended that the net restowage expenses or "special charges" of $337,789.80, should be apportioned among the various parties, so that Duferco would bear only its proportionate share of the "special charges" rather than the full cost. (Award at 9.) Each party sought interest on any sums awarded, plus the reasonable costs of the arbitration, including attorney's fees. (Award at 9.)

The Panel held seven hearings to receive evidence and take the testimony of both fact and expert witnesses. (Award at 8.) "Considerable post-hearing documentary evidence was submitted, and counsel extensively briefed the case." (Award at 8.)

By Award dated February 26, 1999, the Panel found that Duferco "failed to follow its own stowage plan" and was, therefore, liable to Owner in damages for the consequences of the improper stowage. (Award at 11, 25.) The Panel directed Canadian Forest to pay to Ocean Wide the sum of $712,502.49; directed Duferco to pay Canadian Forest the sum of $712,502.49; and further directed Duferco to pay to Canadian Forest the (additional) sum of $348,227.66 for hire of the Vessel during the time of its deviation to Cagliari. (Award at 29; Resp't Ocean Wide Mem. at 3.) The Panel included attorneys' fees in these amounts. (Award at 29.)

On April 23, 1999, Petitioner Duferco brought this action to have the Award vacated on the grounds that it was rendered in "manifest disregard of the law." (Pet'r Mem. at 1.) On June 8, 1999, Respondents Ocean Wide and Canadian Forest cross-moved for an order confirming the Award. The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

### III. STANDARD OF REVIEW

**The Court's role in reviewing arbitration awards is appropriately limited "in**

---

8. During the arbitration proceeding, Canadian Forest took no position with respect to the merits of the dispute. Rather, it maintained that irrespective of whether Owner or Duferco was found at fault, it was entitled to indemnity because the relevant terms of its charters with each were identical. Thus, each claim made upon Canadian Forest by Owner is attributed to Duferco. Conversely, all claims asserted by Duferco upon Canadian Forest are attributed to Owner. (Award at 8.)

On July 26, 1996, Trans Sea tendered its defense and assigned all its rights of claim to Duferco, who agreed to indemnify Trans Sea if the Panel were to find it liable for any damages to Canadian Forest. (Award at 7–8.) Accordingly, the Gencon Charter was not at issue and Trans Sea was not a party to either of the arbitration proceedings or these proceedings. (Award at 3, n.1; Pet'r Mem. at 5, n.3.)

order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993). The U.S. Court of Appeals for the Second Circuit has recognized that an arbitration award may be vacated if it is in "manifest disregard of the law." *See Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998), *cert. denied,* 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986); *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892 (2d Cir.1985) (citing *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other grounds by, Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Duferco seeks to have the Award vacated on this basis. (Pet'r Mem. at 1–2.)

The "manifest disregard" standard is a high hurdle for the party seeking to vacate an arbitration award, requiring " 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' " *Siegel,* 779 F.2d at 892 (citation omitted). *Accord Drayer v. Krasner,* 572 F.2d 348, 352 (2d Cir.1978), *cert. denied,* 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978)(quoting *San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.,* 293 F.2d 796, 801 (9th Cir.1961)). The court must find that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan,* 148 F.3d at 202. *Accord Folkways Music Publishers,* 989 F.2d at 111–12; *Merrill Lynch,* 808 F.2d at 934. The error must have been "obvious and capable of

being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Folkways Music Publishers,* 989 F.2d at 111 (quoting *Merrill Lynch,* 808 F.2d at 933).

■ Erroneous application of rules of law or erroneously deciding the facts are not grounds for vacating an arbitration award. *Siegel,* 779 F.2d at 892–93. Further, a court "must not disturb an award simply because of an arguable difference of opinion regarding the meaning or applicability of the laws." *W.K. Webster & Co. v. American President Lines, Ltd.,* 32 F.3d 665, 669 (2d Cir.1994). *Accord Merrill Lynch,* 808 F.2d at 933. Courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). So long as the arbitrators explain their conclusions "in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691, 704 (2d Cir.1978)(emphasis added). *Accord In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 95 (2d Cir.1988).

## IV. ANALYSIS

### Time Charter Party Provisions

The relevant provisions of the time charters are Clauses 8 and 15, (Award at 3.), which read as follows:

8. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and

discharge the cargo at their expense and under the supervision of the Captain

. . . . .

15. That in the event of loss of time from deficiency or default of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause, the payment of hire shall cease for the time thereby lost until the vessel has returned to the same or equivalent position; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

Clause 19 of the time charters specifies that general average "shall be adjusted, stated and settled, according to the York–Antwerp Rules 1974, at such port or place as may be selected by Owners and Charterers by mutual agreement." (Resp't Ocean Wide Mem. at 29, n.5; France Aff., Ex. 1; Stein Aff., Ex. D.) The relevant provision of the York–Antwerp Rules (1974) is Rule X(b), (Award at 27.), which reads as follows:

> The cost of handling on board or discharging cargo fuel and stores whether at a port or place of loading, call or refuge shall be admitted as general average, when the handling or discharge was necessary for the common safety (or to enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary for the safe prosecution of the voyage . . . )
>
> The cost of handling on board or discharging cargo, fuel or stores shall not be admissible as general average when incurred solely for the purpose of res-

towage due to shifting during the voyage, unless such restowage is necessary for the common safety.

Duferco claims that the Panel acted in "manifest disregard of the law" by failing to apply certain principles of admiralty law as follows: (1) that the owner of a vessel has a non-delegable duty to ensure the seaworthiness of the vessel, and is responsible for approving the loading and stowage of a cargo in order to ensure that a vessel is not rendered unseaworthy by a deficient stow, and (2) that where an event of general average has been declared, and where restowage of cargo is necessary for the common safety of that ship, crew and cargo, or for the vessel's "safe prosecution of [its] voyage," the costs of restowage must be included as part of the general average. (Pet'r Mem. at 2–3.)

**The Panel concluded that the cargo collapse occurred as a result of negligent stowage by Duferco's agent ILVA, and that Duferco was responsible to Owner in damages. (Award at 19, 25.)**

While Duferco acknowledged that it had contractual responsibility to load, stow, lash, secure and dunnage the cargo, it nevertheless argued: (1) that Owner had an "overarching and non-delegable duty to ensure the PUNICA was seaworthy," (2) since the Master was inexperienced with steel slab cargoes, he had "the duty to inquire about and familiarize himself with the cargo, and to supervise the loading operation," and (3) "the Master stated in writing that the stowage and securing at Taranto had been completed to his satisfaction." (Award at 20.)

Here, the Panel was persuaded by Owner's argument that it is necessary to distinguish between "damages that are a proximate result of improper stowage and those arising out of the breach of an [o]wner's warranty of seaworthiness." (Award at

20.) Thus, the Court in *International Produce, Inc. v. S.S. Frances Salman*, 1975 A.M.C. 1521, 1544–45 (S.D.N.Y.1975), stated:

> [T]he vessel was unseaworthy in two respects: (a) by reason of the unseaworthy fresh water system; and (b) by reason of the improper stowage. Netumar, the charterer, is liable for unseaworthiness by reason of improper stowage. This Court disagrees with the holding in *Horn v. Cia de Navegacion Fruco, S.A.*, 1968 AMC 2548, and 1969 AMC 1495, 404 F.2d 422, 433 (5th Cir.1968), *cert. denied*, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477, 1970 AMC 256 (1969), which would impose liability on the shipowner for unseaworthiness as the result of improper stowage, despite the inclusion of Clause 8 in the charter party.

The Court in *International Produce* explicitly rejects the notion that the owner is responsible for improper stowage when Clause 8 is incorporated into the charter party agreement.[9]

■ The obligation to load, stow, trim and discharge the cargo at common law rests on the owner. *See Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 330 (2d Cir. 1972); *Filikos Shipping Corp. of Monrovia v. Shipmair B.V.* (The "Filikos"), 1 Lloyd's Rep. 9 (C.A.1983). Clause 8 of the NYPE form, however, has the effect of shifting from owners to charterers the primary responsibility for loading, stowing and trimming the cargo. *See Nichimen*, 462 F.2d at 331–32; *Court Line, Ltd. v. Canadian Transp. Co.*, 67 Lloyd's List L. Rep. 161, 1940 WL 32957 (H.L.1940).

■ Clause 8 also reflects the role of the master. It states that "[c]harterers are to load, stow, trim and discharge the cargo at their expense and under the supervision of the [c]aptain." (Award at 3; France Aff., Ex. 1; Stein Aff., Ex. D.) The master, "wears two hats" or performs a dual agency:

> First, he is responsible for carrying out the Owner's responsibility to furnish a vessel that is fit for sea and Charterer's cargo, in which role he and the crew act as servants of Owner. Second, the Master is responsible for supervising the loading, stowing, trimming and discharging of the cargo. In that role he and the crew act as borrowed servants of Charterer.

(Award at 20–21.), *Accord* Michael Wilford et al., *Time Charters* 317 (4th ed.1995). Clause 8 makes the master the "borrowed servant" of the charterer for the purpose of loading, stowing, and discharging cargo. (Award at 21.)

The leading American case on the respective obligations of owner and charterer for the loading and stowage of the cargo is *Nichimen Co. v. M.V. Farland*, 462 F.2d 319 (2d Cir.1972). In *Nichimen*, the Court stated:

> The charterer's prime responsibility for loading and stowage is not destroyed by the qualification that this shall be "under the supervision of the Captain," a phrase doubtless intended to make plain the master's right to veto a plan that might imperil the seaworthiness of the vessel . . . not to impose on him a duty, as the owner's agent, to supervise the charterer's stow. Had the stowage in this case been properly designed by the charterer's agent, no damage would have occurred. The primary negligence was of the charterer's agent, and we can discern no valid reason why the charterer should now be allowed to shift the cargo

---

9. In *International Produce,* District Judge Tenney explicitly rejected the rationale of *Horn,* 1975 A.M.C. at 1544–45, 404 F.2d 422.

damage to the owner on the theory that the Captain, on behalf of the owner, should have corrected its improper stowage.

462 F.2d at 332. The master is not responsible for the negligent stowage of a vessel by the charterer (where Clause 8 has been incorporated into the charter), although he has a right, as an agent of the owner, to object to a stowage plan which may jeopardize the seaworthiness of the vessel. *See, e.g. Fernandez v. Chios Shipping Co.,* 458 F.Supp. 821, 826 (S.D.N.Y. 1976)("[T]he ship captain's supervisory role is reduced to that of vetoing any plan which would imperil the seaworthiness of the ship . . .").

Duferco argues, unpersuasively, that the Panel's reliance on *Nichimen,* among other cases, is misplaced because these cases involved claims of negligent stowage leading to cargo damage only. (Pet'r Mem. at 26.) (emphasis added). This view is too narrow because *Nichimen* has explicitly been extended beyond cargo damage liability. *See, e.g. Fernandez v. Chios Shipping Co.,* 458 F.Supp. 821 (S.D.N.Y.1976)(permitting a shipowner to recover from a time charterer with respect to a personal injury claim by a longshoreman); *The S.S. Mount Athos,* S.M.A. 1570 (Arb. N.Y. June 29, 1981) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions) (holding the charterer responsible for damage to a vessel that occurred as a result of stevedore negligence).

■ Courts have found that a shipowner's duty to furnish a seaworthy vessel does not vitiate a charterer's responsibility for damages arising out of improper stowage when the charterer is at fault. The Court in *Fernandez* stated:

It seems clear to this court that, as construed by the Court of Appeals in *Nichimen,* clause 8 shifts primary responsibility for the active control of cargo operations to the charterer . . . Moreover, where, as in this case, the finding of unseaworthiness against the ship owner is, in fact, predicated upon unsafe conditions created by stevedore and shipper rather than upon any conditions created by the ship owner, there seems to be no basis in equity for denying indemnity from the charterer, when the ship's captain retained such limited responsibility for cargo operations under the charter agreement.

458 F.Supp. at 827. *See also The M/V TUSA,* S.M.A. 2794 (Arb.N.Y. Sept. 5, 1991) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions); *The M.S. Olympic Melody,* S.M.A. 2474 (Arb.N.Y. Apr. 26, 1988) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions); *The M.V. Andros Oceania,* S.M.A.2012 (Arb.N.Y. Aug. 28, 1984) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions); Michael Wilford et al., *Time Charters* 316–22 (4th ed.1995).

■ As noted by the Panel, "there has been no allegation that the Master interfered with the stowage or altered the ILVA stowage plan by his own affirmative actions, actions that might mitigate these circumstances in favor of Duferco." (Award at 22.) (emphasis added). The Panel's decision to hold Duferco liable to the Owner for damages has a clear foundation in case law and there exists, here, substantially more than a "barely colorable justification for the outcome reached." *Andros Compania Maritima,* 579 F.2d at 704. Confirmation of the award cannot be prevented merely by arguments in favor of a different result. *Id.*

The cases cited by Duferco cannot sustain a finding by this Court that the Panel

acted in "manifest disregard of the law." [10] *Continental Grain* did not involve Clause 8, but rather an "oral voyage charter contract"; the decision was based on general maritime law. 972 F.2d at 428. In *The Union Spirit*, the master was vocally critical of the stowage being carried out by the charterer's stevedores, but nevertheless agreed to sail with known deficiencies uncorrected. In *The M.V. Caribbean Sky*, the owner was held liable for the failure of lashing equipment that the owner was obligated to provide. In *A.B. Marintrans v. Comet Shipping Co.* (The "Shinjitsu Maru No. 5"), the words "and responsibility [of the Captain]" were added at the end of Clause 8. *See* Michael Wilford et al., *Time Charters* at 318 (4th ed. 1995) ("Do these words [and responsibility of the Captain] shift liability for improper stowage back to the owner, as may be the case in England? Probably not.").

Duferco also cites cases for the proposition that, under Clause 8, the master has an overriding responsibility for the cargo when the vessel's seaworthiness is implicated. (Award at 24; Pet'r Mem. at 28–30.) But these cases are also distinguishable from the instant action. In *The M/V Master Panos*, S.M.A. 3501 (Arb.N.Y. Jan. 15, 1999) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions), the Panel found (1) that the master was "acutely aware of the GM problem and intended to modify it as best he could as soon as he could, but he didn't" and (2) that the master "compounded the stability

problem when he sailed the vessel into the storm, handling her as he did." In *The Oneida*, 108 F. 886 (S.D.N.Y.1901), there is no discussion of Clause 8 or similar stipulations. In *Petition of Long*, 439 F.2d 109 (2d Cir.1971), the master disobeyed a letter of instruction and overloaded the vessel. There was also evidence that the vessel's "evaporators and boilers were inoperative for much of the voyage" and that "a leak in the rudder stock gland permitted sea water to enter the steering room which the crew drained off by making a hold in one of the bulkheads, permitting the water to go lower in the interior of the ship." 439 F.2d at 112. In *Moore–McCormack Lines, Inc. v. Armco Steel Corp.*, 272 F.2d 873 (2d Cir.1959), the Court suggested that "the ship's navigation was at fault." 272 F.2d at 878.

Each of these cases involves some "overarching contractual differences, or elements of contributory vessel or Master's fault and are thus readily distinguishable" from the instant action. (Award at 24.) **While Duferco may have "an arguable difference of opinion regarding the meaning or applicability of the laws," no basis is offered to disturb the arbitration award.** *W.K. Webster & Co. v. American President Lines, Ltd.*, 32 F.3d 665, 669 (2d Cir.1994).

*Transocean Liners* is relevant to the instant action. In detailing why a court would hold a charterer, and not an owner,

**10.** Duferco seeks to rely on cases such as *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426 (1st Cir.1992); *The Union Spirit*, S.M.A. 1854 (Arb.N.Y. July 13, 1983) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions); *The M.V. Caribbean Sky*, S.M.A. 2827 (Arb.N.Y. Jan. 15, 1992) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions); and *A.B. Marintrans v. Comet Shipping Co.* (The "Shinjitsu Maru No. 5"), 1 Lloyd's Rep. 568 (Q.B.1984), for the proposition that, in spite of Clause 8, the master has an overriding responsibility for the cargo when the vessel's seaworthiness is implicated. (Award at 24; Pet'r Mem. at 28–30.) However, as noted by the Panel, "these cases involved some overarching contractual differences, or elements of contributory vessel or [m]aster's fault and are thus readily distinguishable from the facts of the [instant action]." (Award at 24.)

responsible for bad stowage, the Court stated:

> It would be a remarkable construction which produced the effect that so long as the loading was carried out by the charterers badly enough to put the [sic] or other cargo but not the vessel at risk the charterers would be liable and the owners would not but the moment the loading was so badly carried out that it made the vessel itself unseaworthy the entire responsibility fell upon the owners and the charterers were relieved of it. **That would mean the worse the loading the better for the charterers and it is often not an easy question ... to determine the moment when the line between bad stowage and unseaworthiness is crossed.**

*Transocean Liners Reederei G.m.b.H. v. Euxine Shipping Co.* (The "Imvros"), 1 Lloyd's Rep. 848, 1999 WL 250015 (Q.B. 1999) (emphasis added). Courts have distinguished between "damages that are a proximate result of improper stowage and those arising out of the breach of an [o]wner's warranty of seaworthiness." (Award at 20.) *See Nichimen*, 462 F.2d at 332–33; *Fernandez*, 458 F.Supp. at 827; *International Produce*, 1975 A.M.C. at 1544–45.

■ The Court also finds that the Panel did not act in manifest disregard of the law in rejecting Duferco's argument that the Master had "the duty to inquire about and familiarize himself with the cargo, and to supervise the loading operation." **(Award at 20.) The words "under the supervision of the [c]aptain," in Clause 8 do not impose upon the captain an affirmative duty to supervise the charterer's stow.** *See Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 332 (2d Cir.1972) (holding that this phrase "doubtless intended to make plain the master's right to veto a plan that might imperil the seaworthiness of the vessel ... not to impose on him a duty, as the owner's agent, to supervise the charterer's stow."); *Fernandez v. Chios Shipping Co.,* 458 F.Supp. 821 (S.D.N.Y.1976)("[T]he ship captain's supervisory role [under Clause 8] is reduced to that of vetoing any plan which would imperil the seaworthiness of the ship ...."). In *A/S Brovanor v. Central Gulf Steamship Corp.,* 323 F.Supp. 1029 (S.D.N.Y.1970), a "leading case on this point," (Award at 22.), the Court stated:

> Although the master accepted the stowage plan as advanced by Central Gulf his primary concern related to the seaworthiness of the vessel, its navigation, and care. As to the stowage of alumina, the evidence is compelling that Central Gulf did not rely upon the master's judgment; to the contrary, he relied upon Central Gulf's.
>
> Central Gulf's contention that it relied on the presumed superior knowledge and experience of the master as to the proper stowage of alumina flies in the face of the facts. Central Gulf's representatives, aware of the master's inexperience with alumina, stressed their own experience. In practical terms Central Gulf took over the stowage and separation of alumina which was within its special competence. The master testified that, based upon the information they gave him about alumina, he considered the stow safe and proper and in this he was justified. Under all the circumstances it cannot be said that the master failed to exercise reasonable care with respect to the stowage, or its supervision.

323 F.Supp. at 1032.

■ In the instant action, the Panel correctly noted that "[a] vessel's master cannot be held to be an expert in the stowage of every conceivable cargo." (Award at 22.) The Panel further found that "ILVA clearly and forcefully held itself out as an

expert in both the [California Block Stow] method and in the stowage and securing of steel slabs generally." (Award at 22.) Just as the Court in *A/S Brovanor* held that the charterer had, in practical terms "t[aken] over the stowage and separation of alumina which was within its special competence," 323 F.Supp. at 1032, the Panel here found that

> ILVA had, in effect, usurped the supervision of the cargo operation by virtue of its superior knowledge of a specialized stowage system completely unfamiliar to the Master. ILVA were the acknowledged experts here and the Master had no basis to question their stowage and securing arrangements. Certainly, the Master had a duty to exercise due diligence with respect to the vessel's seaworthiness, and the majority finds that he did so.

(Award at 23.) **The Panel's fact finding that the master exercised due diligence should not be disturbed by this Court.** *See W.K. Webster & Co.,* 32 F.3d at 669; *Siegel,* 779 F.2d at 892–93.[11]

**While the Panel determined that the Master had a duty to exercise "due diligence with respect to the vessel's seaworthiness," they also found that "he did so."** [12] (Award at 23.) **The Panel determined that the damage occurred because "ILVA failed to follow its own stowage plan."** (Award at 11.) (emphasis added). The Panel stated that to relieve Duferco of all responsibility for the casualty based on the form letter given to, and signed by, the Master, would "require [the Panel] to ignore the dominant role played by ILVA." (Award at 24.) Further, the Panel noted that this was a "standard form letter printed on ILVA's letterhead" and that "[s]tevedores all over the world customarily require masters to sign such letters before the vessel is allowed to depart." (Award at 24.)

In holding that the form letter employed here did not transfer responsibility for the improper stowage to Owner, the Panel followed established precedent. *See The M.S. Olympic Melody,* S.M.A. 2474 (Arb.N.Y. Apr. 26, 1988) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions); *The M/V La Cordillera,* S.M.A. 2728 (Arb.N.Y. Nov. 26, 1990) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions).

Duferco's argument that the Master did not exercise due diligence was (a fact issue) rejected by the Panel. It fails to support a claim that the Panel acted in "manifest disregard of the law." At most it is an argument for a different outcome, i.e. that the Panel erred either in its "application of rules of law" or in "decid[ing] the facts," neither of which positions (even if true) is grounds for vacating an arbitrator's award. *Siegel,* 779 F.2d at 892–93.

***Damages and the Exclusion of Certain Costs from the General Average***

Duferco claims that the Panel "disregarded the clear and unambiguous provi-

---

11. Duferco claims that a "mere superficial inspection" has been held to be insufficient to establish an exercise of due diligence on the part of the owner to make a vessel seaworthy. (Pet'r Reply Mem. at 10, n.7.) (citing *Ore Steamship Corp. v. D/S A/S Hassel,* 137 F.2d 326, 328 (2d Cir.1943)). However, the cited passage refers to the seaworthiness of the vessel itself and not to the seaworthiness of the stowage. *Ore,* therefore, is not "clearly applicable to the case," *Halligan,* 148 F.3d at 202, and, at best, demonstrates no more than an "arguable difference of opinion regarding the meaning or applicability of the laws." *W.K. Webster & Co.,* 32 F.3d at 669.

12. Although the Master was persuaded by ILVA to follow their stowage and securing plan, he and the Chief Mate performed their own pre-loading stability calculations. In addition, upon completion of loading, the Vessel's hatch covers were surveyed and found watertight. (Award at 23, n.18.)

sions of the York–Antwerp Rules, and the settled law of general average" by concluding that the costs of restowage were properly excluded from the general average and by assessing these costs solely against Duferco. (Pet'r Mem. at 33.)

Clause 19 of both time charters specifies that general average "shall be adjusted, stated and settled, according to the York–Antwerp Rules 1974." (Resp't Ocean Wide Mem. at 29, n.5; France Aff., Ex. 1; Stein Aff., Ex. D.) Rule X(b) of the York–Antwerp Rules (1974) states in relevant part that "[t]he cost of handling on board or discharging cargo, fuel or stores shall not be admissible as general average when incurred solely for the purpose of restowage due to shifting during the voyage, unless such restowage is necessary for the common safety." (Award at 27.)

Duferco asserts that "the Panel's conclusion that the restowage was not necessary for the 'common safety' of the ship, crew and her cargo is not only contrary to the undisputed facts, but is in manifest disregard of the law." (Pet'r Mem. at 34.) Therefore, Duferco argues that the restowage costs should be (re)apportioned among the contributing interests. (Award at 26.) Duferco alleges that the Master felt that "it was absolutely necessary for the safety of the people on board that [he] must seek some shelter." (Pet'r Mem. at

10; Stein Aff., Ex. B, Tr. At 270–72.)[13] Further, Duferco argues that "[b]y any standard, the shifting of more than 16,000 tons of steel slabs aboard the PUNICA and the presence of loose slabs in the holds clearly presented a 'real and substantial' danger to the common safety of the ship, the crew and the cargo." (Pet'r Mem. at 36.)[14]

Duferco relies upon a passage from Leslie J. Buglass, *Marine Insurance and General Average in the United States* 253–54 (3rd ed.1991), which states that when restowage is performed for the common safety, the allowance of such restowage in general average is not prohibited. (Award at 27; Pet'r Mem. at 35; France Aff., Ex. 11.) However, as the Panel correctly pointed out, **"Buglass does not address the special circumstances of cases such as this, where the loading is carried out, not by the owner, but by the cargo interests."** (Award at 28.)(emphasis added). Moreover, as stated in Volume 2 of Thomas J. Schoenbaum, *Admiralty and Maritime Law* 359 (1994), "where the loss is caused by latent defects in the cargo, the cargo cannot recover from the vessel in general average." Based upon these authorities and upon the Panel's finding that Duferco alone is responsible for damages, the Court is persuaded that Duferco's con-

---

**13.** It should be noted that the Master's statement, is "not conclusive." *Orient Mid–East Lines, Inc. v. Shipment of Rice*, 496 F.2d 1032, 1039 n. 13 (5th Cir.1974), *cert. denied*, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975). *Cf. Ravenscroft v. United States*, 1936 A.M.C. 696 (E.D.N.Y.1936), *aff'd*, 88 F.2d 418 (2d Cir.1937), *cert. denied*, 301 U.S. 707, 57 S.Ct. 940, 81 L.Ed. 1361 (1937) (holding that in order for damages to be included in general average, there must be a real or impending peril, not merely a mistaken apprehension of peril).

**14.** Duferco's assertions notwithstanding, the Panel made no finding that there was a real

and substantial danger to the common safety of the ship, the crew and the cargo, although the facts and circumstances of the restowage were presented to and considered by the Panel. Nor do arbitrators have any obligation to explain their conclusions. *See, e.g., Wilko v. Swan*, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953); *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir.1972)("the Supreme Court has made it clear that there is no general requirement that arbitrators explain the reasons for their award"). It seems quite clear that the Panel credited the arguments of Owner on this issue. (Award at 27–28.)

tention amounts to no more than an "arguable difference of opinion regarding the meaning or applicability of the laws" and/or a dispute as to the facts and, therefore, finds that the Panel's decision is not in "manifest disregard of the law." *W.K. Webster,* 32 F.3d at 669.

Duferco also claims that the Panel acted in "manifest disregard of law in failing to hold Owner responsible for all costs incurred as part of the general average, including the costs of restowage." (Pet'r Mem. at 36.) Duferco cites *Orient Mid–East Lines, Inc. v. Shipment of Rice,* 496 F.2d 1032 (5th Cir.1974), for the proposition that a carrier should not recover the general average for damage proximately caused by unseaworthiness when a carrier fails to provide a seaworthy ship. (Pet'r Mem. at 36.) However, the instant action is distinguishable from *Orient Mid–East Lines* in that the Court there found the owner at fault for the damages. The Panel in the instant action found the charterer at fault. (Award at 25.)[15]

The Court also finds that the Panel did not act in "manifest disregard of the law" in holding Duferco responsible for all hire costs related to the restowage operation. Duferco claims that the Panel ignored Clause 15 of the time charters, which provides that upon an event of general average, "the payment of hire shall cease for the time thereby lost until the vessel has returned to the same or equivalent position...." (Pet'r Mem. at 38–39; France Aff., Ex. 1; Stein Aff., Ex. D.) Duferco cites *Clyde Commercial S.S. Co. v. West India S.S. Co.,* 169 F. 275, 278 (2d Cir.

1909) as support for its proposition that the off-hire provision states "absolute categories in which the parties intended the hire to be suspended." (Pet'r Mem. at 39.) (quoting *Clyde Commercial,* 169 F. at 278). However, as noted by Ocean Wide, *Clyde Commercial* "does not address the situation where the charterer, the party responsible for paying the hire, is the one responsible for the loss of use of the vessel...." (Resp't Ocean Wide Mem. at 35.)[16]

In *The M.V. Andros Oceania,* S.M.A. 2012 (Arb.N.Y. Aug. 28, 1984) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions), the collapse of the deck-stow of a cargo of logs was found to be a general average accident, but charterer's claim for return of hire was rejected because the accident resulted from charterer's failure to properly load and secure the cargo. The arbitration panel in *The M.V. Andros Oceania* stated that:

> while an average accident resulting from the fault of [o]wner, or even of neither party, might bring clause 15 into play and put the ship off-hire for the time lost, it would be totally inequitable to allow that to occur when the event causing the average accident resulted from the fault of the [c]harterers.

In *The M/V Kartini,* S.M.A.1958 (Arb.N.Y. Apr. 23, 1984) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions), the panel found that the introduction of hazardous cargo, without appropriate safeguards, was the fault (negligence) of the supplier and stevedore which was imputed to the charterer. The panel in *The M/V*

---

**15.** Duferco's reliance on *Gemini Navigation, Inc. v. Philipp Bros. Div. of Minerals & Chemicals Philipp Corp.,* 499 F.2d 745 (2d Cir.1974) and *Master Shipping Agency, Inc. v. M.S. Farida,* 571 F.2d 131 (2d Cir.1978) is misplaced for the same reason.

**16.** In *Clyde Commercial,* a case decided when it was still common practice for the ship owner to load and stow cargo, the Court stated that "article 15 must be understood to state absolute categories in which the parties intended the hire to be suspended whether the owner was at fault or not...." 169 F. at 278 (emphasis added).

*Kartini* stated that the "[c]harterer is not permitted to place the vessel offhire where the event causing the loss of time is due to [c]harterer's breach of the Charter Party." The panel in *The M/V Kartini* also cites *Nourse v. Elder Dempster & Co.*, 13 Lloyd's List L. Rep. 197, 1922 WL 16285 (K.B.1922), which states that it would be "an absurd result if it were held that hire was to cease when something for which the owner is not responsible causes the loss of time." 13 Lloyd's List L. Rep. at 198. In *The M.S. Olympic Melody*, S.M.A. 2474 (Arb.N.Y. Apr. 26, 1988) (LEXIS, Admiralty, Society of Maritime Arbitrator Award Decisions), the panel ruled that hire during the period of deviation was payable to the owners of the vessel by the charterer since "[n]o fault [was] attributed to the ship...."

Duferco also claims that the Panel's assessment against Duferco for the re-restowage costs incurred as a result of the faulty restowage operation at No. 3 hold in Cagliari and the hire costs resulting from the delay "rests upon nothing but baseless speculation." (Pet'r Mem. at 38.) The Court disagrees. The Panel found that no net loss of time resulted from the delays caused by the improper restowage and subsequent re-restowage at No. 3 hold "because restowage and other necessary work (including welding support brackets in the remaining four holds) continued without interruption **beyond the completion of No. 3 hold.**" (Award at 26.)(emphasis added). **Further, the Panel noted that the entire stevedoring contract was renegotiated after the problem regarding the restowage efforts in No. 3 hold arose and it is "reasonable and probable that the parties would have made ad-** justments for such costs at that time...." (Award at 26–27.) This determination is not mere speculation; it is supported by evidence in the record, including at least two of the surveyors' reports submitted to the arbitrators. (Resp't Ocean Wide Mem. at 32–33.) The Panel also noted that the general average adjustment was prepared jointly by adjusters appointed by both vessel and cargo interests. (Award at 28.) Under these circumstances, the Panel stated that it was "satisfied that the adjusters correctly excluded the restowage expenses pursuant to Rule X(b)." (Award at 28.)

■ After reviewing the record, the Court finds that the Panel "made [at least] a reasonable inference [17] based on the evidence before it," (Resp't Ocean Wide Mem. at 32.), given that cargo interests jointly prepared the general average adjustment and that there is evidence of Owner making numerous efforts to obtain the most economically advantageous restowage agreement and to save time. (Resp't Ocean Wide Mem. at 33; France Aff., Exs. 14, 18, 19 at 47–48.) Duferco's claim is, therefore, at best a claim that the Panel erroneously decided the facts or incorrectly applied the law, which are not grounds for vacating an arbitration award. *Siegel,* 779 F.2d at 892–93.

### Attorneys' Fees for this Proceeding

Finally, though "[n]one of the arbitration agreements, or the Consolidation Agreement, confer specific authority for the award of attorneys' fees," (Award at 29), **both** Duferco and Owner seek an award of attorneys' fees and costs incurred in the instant proceeding.[18] The parties,

---

17.   *See Polsby v. St. Martin's Press, Inc.,* 2000 WL 98057 at *2 (S.D.N.Y. Jan. 18, 2000)(stating that "inference" is legitimate, "speculation" is not).

18.   The Panel determined (and the Court confirms) that an award of attorneys' fees incurred by Owner during the arbitration proceedings was appropriate because "each

however, have provided relatively scant briefing as to the basis for such an award here. As a result, if the parties wish to pursue the issue of attorneys' fees in this proceeding (as an issue separate and apart from confirmation of the Award), the Court recommends there be additional briefing.[19]

## V. CONCLUSION

The Court finds that the Panel engaged in lengthy and extensive and professional review and analysis of the factual and legal merits of this case (as reflected in the record) and did not act in manifest disregard of the law in reaching its decisions. The motion to vacate the Award is denied and the motion to confirm the Award is granted. The Clerk is respectfully directed to enter judgment.

party has requested an award of its reasonable attorney's fees and furnished evidence of same, and the panel therefore considers the Agreements to have been modified accordingly." (Award at 29.)

19. Counsel may submit a (preferably joint) letter on or before April 21, 2000 requesting a pre-motion conference devoted to this issue.