U.S. SHIP MANAGEMENT,
INC., Plaintiff,

v.

MAERSK LINE, LIMITED, Defendant.

No. 01 CIV 9689 VM.

United States District Court,
S.D. New York.

Feb. 13, 2002.

Terry L. Stolts, Burlingham, Underwood, L.L.P., New York, NY, for U.S. Ship Management, Inc.

Brian A. Herman, Stuart M. Altman, Morgan, Lewis & Bockius, L.L.P., New York, NY, for Maersk Line, Ltd.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff U.S. Ship Management, Inc. ("USSM") brought this action seeking to vacate an award issued in favor of defendant Maersk Line, Limited ("Maersk") in an arbitration proceeding between the parties. Now before the Court are several motions and cross-motions. Maersk moved for an order confirming the arbitration award and, pursuant to Fed.R.Civ.P. 12(b)(6), dismissing USSM's complaint, or alternatively, for summary judgment under Fed.R.Civ.P. 56. In response, USSM cross-moved to vacate the award. For the reasons set forth below, the Court grants Maersk's motion and denies USSM's.

## I. *FACTUAL BACKGROUND*

Maersk is a part of A.P. Moller ("Moller"), a maritime company based in Denmark. In 1999, Moller purchased the international shipping assets of CSX/Sea–Land Services, Inc. ("Sea–Land"), a United States corporation. The sale included Sea–Land's interest in nineteen container vessels flying United Stated flags. As part of the transaction, fifteen of these vessels were then enrolled in operating agreements pursuant to the Maritime Security Program ("MSP") of the United States Maritime Administration ("MARAD"). Participation of these vessels in the MSP required compliance with Section 2 ("Section 2") of the Shipping Act of 1916 (the "Shipping Act"), 46 App. U.S.C. §§ 1187 *et seq.* Under that provision, only qualified United States citizens are eligible for enrollment in the MSP.[1] The MSP authorizes payment of an annual fee per ship to participants in return for the Government's right to operate the vessels when necessary for support of certain military uses and other public purposes.

Because Maersk was a foreign corporation, it did not qualify as a United States citizen as defined in Section 2 for the purposes of the MSP. To comply with this requirement, at the time of the Sea–Land/Maersk transaction, USSM was formed as a separate United States operating company qualifying as a Section 2 citizen. USSM chartered the nineteen vessels and acquired all other operating rights from Sea–Land, which, with the approval of MARAD, assigned its fifteen MSP Operating Agreements to USSM. In turn, USSM entered into nineteen time-charter agreements with Maersk (the "Time Charters").[2] (*See* Affirmation of Radoje Vulovic in Support of Motion to Vacate an Arbitration Award, dated December 13, 2001 ("Vulovic Aff."), ¶ 10, Exs. C, D, E.) By the terms of the Time Charters, Maersk is entitled to direct the movement and use of the vessels, but USSM as owner remains in possession and control of them and responsible for providing the ships' crews, supplies and maintenance.

Article 33 of the Time Charters obligated USSM to provide Maersk periodic reports containing certain financial statements regarding USSM's business.[3] For

---

1. Section 2 of the Shipping Act defines an eligible citizen as a United States corporation whose chief executive officer, chair of the board and majority shareholders and directors are United States citizens, and whose controlling interest in the corporation is not by any means whatsoever "conferred upon or permitted to be exercised by any person who is not a citizen of the United States." 46 App. U.S.C. § 802(b).

2. Under an exception to the MSP, the Shipping Act allows participation in the program by up to five vessels not operated by Section 2 citizens. *See* 46 App. U.S.C. § 1187a. MARAD assigned four of those exceptions to ships owned by Maersk, hence fifteen of the vessels USSM time-chartered to Maersk were enrolled in the MSP and subject to the Section 2 requirement. (Vulovic Aff., ¶ 10.)

3. Article 33 provides in pertinent part:

(a) [USSM] shall at all times maintain and keep true and correct records in accordance with generally accepted accounting principles consistently applied relating to Charter Hire, Drydocking Expenses, Supplemental Expenses, and all other records regarding the management and operation of the Vessels, as well as all data necessary or proper for the settlement of accounts between [USSM] and [Maersk].

(b) [USSM] shall furnish [Maersk] such standard or special reports or copies relating to the operation of the Vessel and all charges of any nature whatsoever hereunder or under the Bareboat Charter, when and as required by the Secretary, and in, [sic] any case, within 120 days after the end of each current annual accounting period of [USSM], audited, unconsolidated financial statements of [USSM] prepared in accordance with generally accepted accounting standards in the United States.

reasons about which the parties disagree, the Time Charters' disclosure requirement respecting the four USSM vessels not participating in the MSP was broader than that pertaining to the fifteen MSP-enrolled.

Article 28 of the Time Charters contained an arbitration clause. Under this provision, the parties agreed to submit to arbitration any dispute between them arising out of or in connection with the Time Charters or their enforcement or interpretation. The arbitration provision requires that each of the three arbitrators "shall be a commercial person knowledgeable in the operation and chartering of container vessels and the operation of scheduled container services." (Vulovic Aff., ¶ 10, Ex. C at 41.)

In May 2001, a dispute arose between USSM and Maersk that eventually prompted the invocation of the arbitration clause and commencement of the instant case. As called for by the Time Charters, USSM provided Maersk certain financial information which USSM limited to the direct operational income to USSM and expenses of the nineteen vessels. By written notice dated May 2, 2001, Maersk asserted that the information USSM had supplied did not comply with the financial disclosure requirement of Article 33 and asked for additional material regarding USSM's profitability and executive compensation. USSM refused the request, responding that any additional financial disclosure was neither required by the Time Charters nor permitted by MARAD regulations. (*See* Vulovic Aff., ¶ 23, Ex. M. at 1–2.)

In this regard, on June 21, 2001, Stuart R. Breidbart ("Breidbart"), USSM's General Counsel, wrote to Bruce J. Carlton, MARAD's Acting Deputy Maritime Administrator, requesting MARAD's confirmation that "USSM's interpretation of the financial reporting provisions of the Time Charters is correct and in compliance with U.S. citizenship requirements and the Operating Agreements." (Affidavit of Stuart M. Altman, dated Nov. 20, 2001 ("Altman Aff."), ¶ 12, Ex. 10 at 1.) William F. Trost, MARAD's Acting Associate Administrator for National Security, answered by letter dated June 27, 2001 (the "MARAD Letter"). Trost stated that the purpose of Article 33 of the Time Charters was to allow Maersk access "only to financial information related to operation and management of the vessels, separate and apart from all other financial information of USSM" and that providing the broader disclosure Maersk requested was inconsistent with the general purposes of the Time Charters and requirements of Section 2, and would "undermine the viability of USSM as a U.S. citizen operator of MSP vessels." (Altman Aff., ¶ 12, Ex. 11 at 1–2.) Maersk contends that it had no notice of USSM's June 21, 2001 letter nor of MARAD's reply until the day of the arbitration proceeding here at issue.

Maersk countered USSM's refusal to supply the requested information by serving a Notice of Arbitration on July 5, 2001. Maersk thereby sought an order to compel USSM to furnish the information and named as its arbitrator Emery W. Harper ("Harper"). At that time Harper was President of Harper Consultants, Inc., a firm he had established in 1997 to provide services as a consultant and pursue business interests in matters relating to the shipping industry. Prior to 1997 Harper had worked full-time as a maritime lawyer with a large New York City firm.

USSM objected to Harper's qualifications to serve as an arbitrator, contending that he was not a "commercial person" and thus did "not meet the contractual qualifications set forth in [the Time Charters arbitration provision]." (Altman Aff., ¶ 8,

Ex. 6 at 2.) According to USSM, in order to qualify as a "commercial person" as defined in the Time Charters, the arbitrator's relevant expertise must be acquired while actually serving as a commercial person in the industry and not while working as a lawyer. Harper rejected USSM's view and declined its demand that he recuse himself. (*See* Altman Aff., ¶ 10, Ex. 8 (Letter of Emery W. Harper to Stuart R. Breidbart, dated August 2, 2001 ("Harper Letter")) at 2.)

USSM then designated Peter J. Finnerty ("Finnerty") as its party-arbitrator. After some delay during which USSM contended that the arbitration procedure's 45–day clock had not yet expired, the process recommenced under protest from USSM. Harper and Finnerty served as party arbitrators and the President of the Society of Marine Arbitrators selected A.J. Siciliano as the third member and Chairman of the panel.

An arbitration hearing was held in New York on October 8, 2001. At the end of the proceeding the Panel deliberated and issued a preliminary ruling, supplemented as a Final Award on October 19, 2001, with a partial dissent by Finnerty. (*See* Altman Aff., Ex. 1 (the "Final Award").) The Final Award determined that Maersk was entitled to the additional financial statements in dispute and directed USSM to furnish them. (Final Award, at 14.) The Panel there stated that it was not persuaded that the release of the disputed financial information would violate MARAD regulations. (Final Award, at 13–14.)

Addressing USSM's defense based on the MARAD Letter, the Panel noted that there was no evidence that MARAD had been informed that Maersk already had obtained nearly all of the financial information in dispute and that if "furnishing the additional financials to [Maersk] would cause USSM lose its Section 2 status,

USSM's recourse, if any, would be to MARAD, not to this panel." (Final Award, at 13.)

USSM refused to comply with the award. Instead, seeking MARAD's guidance, USSM forwarded a copy of the arbitration panel's decision to MARAD. On October 31, 2001, in a letter to Breidbart, MARAD's Acting Deputy Administrator for Inland Waterways and Great Lakes endorsed the position expressed in the MARAD Letter and directed that "USSM should not turn over its audited financial statements to [Maersk]." (Vulovic Aff., ¶ 41, Ex. V at 1 ("October Letter").) This letter expressed the view that "any inconsistency between the [financial disclosure provisions of the] MSP and non-MSP charters is due to inadvertence or misrepresentation". (October Letter, at 1.) It concluded that MARAD's approval of the transaction allowing Maersk to charter the USSM ships subject to the MSP operating agreements was:

> conditioned upon USSM maintaining its status as an independent Section 2 citizen. Interpretation of the clauses of any of the time charters which contradicts this condition, such as disclosing overall financial statements of USSM to [Maersk], would jeopardize USSM's status as a U.S. citizen within the meaning of Section 2.

(October Letter, at 2.)

Subsequently, on November 5, 2001 USSM commenced the instant action by serving a Complaint to Vacate an Arbitration Award.

## II. *DISCUSSION*

### A. *PROCEDURE*

■■■ Maersk points to a procedural deficiency in USSM's action. Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 6, a party seeking to vacate an arbitra-

tion award must proceed by motion to the court. *See Johnson v. American Arbitration Ass'n,* No. 98 Civ. 6314, 1999 WL 223154, *2 (S.D.N.Y. Apr.16, 1999). In order to promote speedier, less costly dispute resolution and encourage arbitration, the FAA and Federal Rules of Civil Procedure do not contemplate full-blown litigation for the purposes of contesting an arbitration award with which a party may disagree. *See O.R. Sec., Inc. v. Professional Planning Assocs., Inc.,* 857 F.2d 742, 745 (11th Cir.1988).

Accordingly, Maersk endeavored to place this action in a proper procedural posture by responding to USSM's complaint with a motion to confirm the Panel's award. Alternatively, should the Court determine the case properly initiated by USSM's complaint, Maersk styled its response a motion to dismiss pursuant to Rule 12(b)(6), or for summary judgment under Rule 56, of the Federal Rules of Civil Procedure.

USSM concedes that an action to vacate an arbitration award is to be decided by motion practice, and contends it contemplated that such motions would proceed before the Court following Maersk's answer. (*See* Plaintiff's Memorandum of Law in Opposition to Motion to Confirm and in Support of Cross Motion to Vacate an Arbitration Award, dated December 14, 2001 ("Pltf.'s Mem."), at 13.) Because the action has now been fully presented to Court by the parties' motions and cross-motions, the Court now regards the matter as properly instituted under the FAA and proceeds to rule on this basis.

■■■ Under the FAA's motion procedure, the Court may consider an arbitration action by summary proceeding on the basis of the fully briefed motion papers and without the requirement of a hearing. *See Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,* 157 F.3d 174, 175 (2d Cir.1998). Consistent with the general federal policy favoring arbitration as embodied in the FAA, absent a compelling reason or some manifest disregard of law, the court must confirm an arbitration award. *See* 9 U.S.C. § 9; *Pompano–Windy City Partners Ltd. v. Bear Stearns & Co., Inc.,* 794 F.Supp. 1265, 1272 (S.D.N.Y.1992). The party moving to set aside the award has the burden of proof. *See Rocket Jewelry,* 157 F.3d at 175.

## B. THE DISPUTE

The parties' dispute here centers on two issues: (1) whether Harper was qualified to serve as an arbitrator, and (2) whether the Panel's interpretation of the Time Charters' financial disclosure requirement was made in manifest disregard of applicable law or public policy.

### 1. Harper's Qualifications

■■■ USSM contends that Harper did not satisfy the Time Charters' definition of "commercial person" in that whatever knowledge he may have possessed about the operation, chartering and scheduling of container vessels and services was not acquired from his work as a consultant but from prior services he rendered as a full-time lawyer.

Maersk counters that the determination of whether an arbitrator must decline to serve on the ground that he does not qualify as a commercial person should be left to the discretion of the individual arbitrator, to the same extent permitted under the rule pertaining to self-disqualification on impartiality grounds. *See Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 173 (2d Cir.1984). According to Maersk, Harper, in response to USSM's challenge, thoroughly considered his qualifications prior to the arbitration and concluded that he satisfied the criteria to be regarded a "commercial person". Maersk contends

that that determination merits deference by the Court.

For the purposes of this proceeding, Harper's qualifications may be divided into three categories defined by time and relevant experience.

### a. Post–1997

In 1997, Harper established Harper Consultants, Inc. He asserted that he formed the firm to develop and participate as principals in the management of maritime commercial ventures. (*See* Altman Aff., ¶ 5, Ex. 3 (Transcript of the Arbitration October 8, 2001 ("Tr.")) at 8–9.) In his practice, he dedicates 40 percent of his time to legal matters and 60 percent to consulting and exploring business opportunities. (Tr., at 9.) He stated that his consulting practice has included work with people interested in establishing a container service, chartering a container vessel as a broker and advising with respect to alternative ports of call for ships that included container vessels. (Tr., at 34–37). He has analyzed participation in the acquisition of a cruise line, operation of a ferry service and formation of a bulk shipping operation in the Caribbean, and formation of a maritime service company in the Mediterranean. (Tr., at 9, 13–14.) He served as director and manager of a venture to establish a website network to publish news on topics of interest to the maritime industry and was a member of the International Chamber of Commerce Sea Transportation Committee. (Tr., at 12–13.) He also served of counsel and consultant to the international firm of Inmar Deming, based in Washington, D.C. (Tr., at 9.)

### b. Pre–1997 Non–Legal Experience

Maersk also asserts that during Harper's career as a maritime lawyer he acquired relevant commercial knowledge, including by means of substantial involvement in non-legal matters. Relating to this category, Harper asserted that over a period of five years, he spent a considerable amount of his own time "as an individual who was interested" while participating in discussions and reviews of U.S. Lines' problems with its container services and scheduling, as well as socializing and discussing business matters with executives of clients after regular business hours. (Tr., at 16–17.)

### c. Pre–1997 Legal Experience

In addition, Maersk contends that in the course of Harper's approximately thirty years of practice as an admiralty lawyer, he acquired substantial knowledge of matters relating to the container vessel industry. For example, in connection with representing American Export Inbrandtsen Lines, Ltd. ("AEIL"), Harper worked with AEIL executives in organizing a regularly scheduled containership service. (*See* Harper Letter; Tr., at 19.) This work included negotiating changes in operating contracts, describing routes and service schedules; integrating vessels into AEIL's container service; and participating in discussions of business problems with AEIL executives (Tr., at 20–26.)

In representing OOCL, another major containership client, in its acquisition of container vessels and related equipment and contracts from Seatrain Lines, Harper maintains he was involved locating, identifying and retrieving containers throughout the world, analyzing problems in the container business and integrating vessels into AEIL's regularly scheduled container service. (Harper Letter, at 1–2; Tr. at 20–21, 30.)

In support of their respective positions regarding Harper's qualifications, both parties here rely heavily on *W.K. Webster & Co. v. American President Lines, Ltd.*,

32 F.3d 665 (2d Cir.1994). That case involved interpretation of an arbitration clause that required that "[t]he Arbitrators shall be commercial men." *Id.* at 666. Each party nominated its arbitrator and those two selected the third, a member and chairman, Bartholomew Hennessy ("Hennessy"). At the time of his selection, Hennessy, a lawyer, had served as a consultant to a law firm and later, during the pendency of the arbitration and prior to the panel's final award, he became a partner of the firm. Hennessy had also worked for several companies involved in maritime cargo claims and insurance. The panel ruled against American President Lines, Ltd. ("APL"). In response to Webster's petition to confirm the award, APL sought to vacate it on the ground that Hennessy was not a "commercial man." *Id.* at 666. On appeal from the district court's judgment granting Webster's petition, the Second Circuit affirmed.

As a threshold matter, the Circuit Court rejected the view, expressed in *Aramco Servs. Co. v. EAC Bulk Transp., Inc.*, No. 92–249, 1993 WL 405996, *1 (M.D.Fla. Jan. 25, 1993), that the appointment as an arbitrator of an attorney who had no practical commercial experience was insufficient to satisfy the definition of "commercial men conversant with shipping matters," even if he was generally familiar with the shipping industry from work performed as a maritime lawyer. *See Webster*, 32 F.3d at 668. Instead, the court adopted a distinction expressed in *Pando Compania Naviera S.A. v. Filmo, S.A.S.*, [1975] 1 Lloyd's Rep. 560 (Q.B.), 1975 WL 44747: [4]

> The use of the words "commercial men" would also exclude those whose experience is *solely* as practicing members of

the legal professions. Some of them can rightly be described as "commercial lawyers", but whilst they serve the commercial world they are not of it.

*Webster*, 32 F.3d at 668 (quoting *Pando*, 1 Lloyd's Rep. at 560, 1975 WL 44747) (emphasis supplied by the Circuit Court).

The Second Circuit noted that Hennessy possessed substantial practical experience on the commercial side of the maritime industry, having worked for several companies engaged in maritime insurance, claims and charter parties. The court concluded that this type of non-legal experience is contemplated by the term "commercial man", and that such persons do not lose that status because they later become practicing attorneys, or serve as arbitrators while also practicing law. *See id.* at 669. Because it could not be said that Hennessy had obtained his commercial experience *solely* as a practicing member of the legal profession, the Second Circuit affirmed the district court's judgment in this regard. *See id.*

In the case at hand, the Time Charter's arbitration clause is more specific than that at issue in *Aramco, Webster* and *Pando*. The arbitration provision here required not only that the designated arbitrator be a "commercial person," but one specifically "knowledgeable in the operation and chartering of container vessels and the operation of scheduled container services." There can be little doubt that, under the *Webster* standard, taken as a whole, Harper's experience as a consultant, combined with his knowledge of the shipping industry acquired as a practicing maritime lawyer and during non-legal professional activities, qualify him as a "commercial person" with general expertise in

---

4. In *Pando* the British court approved appointment of an arbitrator who had retired as a solicitor to become a full-time arbitrator. The challenged arbitrator also served on the

boards of directors of several shipping companies. This experience was sufficient to claim status as a "commercial man". *See Pando*, 1 Lloyd's Rep. at 560, 1975 WL 44747.

the shipping industry. The precise question at issue here is whether, as USSM contends, Harper should be disqualified because "[his] knowledge of the containership business was acquired *solely* during the period when he was employed as a lawyer." (Pltf.'s Mem., at 17 (emphasis added).) Thus, USSM appears to concede that Harper in fact possessed general knowledge of the container shipping industry.

As a factual matter, however, the parties disagree as to how and when Harper acquired his practical, non-legal knowledge and experience. USSM maintains that Harper possessed no such expertise other than that which he gained while serving as a full-time lawyer. Maersk, on the other hand, asserts that Harper's relevant qualifications actually derive from the three sources of professional activities and business experience described above.

USSM dismisses the first two categories as not relevant because Harper was serving as a full-time lawyer when he acquired such knowledge. With respect to the third, USSM minimizes the experience. It argues that there was no evidence that since 1997 Harper has done any consulting work for a containership company entailing operation, chartering and scheduling of container vessels; that Harper served only as a broker in chartering a vessel; and that he had never arranged for the bunkering, employed the crew, or issued voyage orders for any container ship. (Tr., at 36–37.)

The Court finds that while USSM seeks to discount or dismiss Harper's relevant commercial experience post–1997 in matters related to container vessels while working primarily as a consultant, Maersk has produced evidence that during this period Harper in fact rendered services that entailed the operation and chartering of container vessels. Harper stated that

he had chartered a container ship, albeit as a broker "authorized to fix the vessel on behalf of the principal" and with a degree of instructions but also some discretion. (Tr., at 35.) He also stated that he had "advised with respect to alternative ports of call in an operation involving several ships," some of which carried "a container or two." He indicated that he had done consulting work with people interested in establishing a container service, although he was not free to discuss the matter in detail. (Tr., at 33.)

■ While the record does not clearly establish how extensive or substantial were Harper's post–1997 business activities and consulting services pertaining to the containership industry, it does refute USSM's contention that Harper's knowledge and commercial experience derived *solely* from his pre–1997 work as a practicing attorney. On this point, USSM, as the party seeking to vacate the award, had the burden of proof by a preponderance of the evidence. *See Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.,* 375 F.2d 577, 582 (2d Cir.1967); *Sun Refining & Marketing Co. v. Statheros Shipping Corp. of Monrovia, Liberia,* 761 F.Supp. 293, 298 (S.D.N.Y. 1991), *aff'd* 948 F.2d 1277 (2d Cir.1991). The Court is not persuaded that USSM has met its burden of establishing that Harper's relevant commercial experience relating to the container vessel industry and acquired after 1997 was not substantial.

■ The Court concludes, however, that even if by itself the quantum of that relevant commercial knowledge and experience Harper gained post–1997 could not be held substantial, that consideration nonetheless would not disqualify him from serving as an arbitrator in this case. In reaching this conclusion, the Court's analysis considered four distinct fact patterns which flow from *Webster* as applied to the

circumstances in the case at bar. First is the situation presented in *Aramco*, 1993 WL 405996, at \*1. There, the arbitration clause at issue required a commercial person familiar with shipping matters. *Id.* The challenged arbitrator was a lawyer who had general familiarity with the maritime industry acquired solely in the course of practicing law but who presumably had no practical commercial experience gained from work in the trade. In *Webster*, the Second Circuit, as discussed above, categorically rejected this standard as insufficient to qualify such a lawyer as a commercial person under the arbitration clause. *See Webster*, 32 F.3d at 668.

A second factual situation, that which was encountered in both *Webster* and *Pando*, arises from an arbitration provision which simply calls for the arbitrators to be "commercial persons" with no further definition, and the challenged arbitrator is, at the time of the arbitration proceeding, a lawyer possessing sufficient commercial experience, whether acquired after retiring from law practice, as in *Pando*, or prior to becoming a full-time practicing attorney, as in *Webster*. What the courts in those cases stressed as a controlling prerequisite for a "commercial person" was familiarity with the customs and practices of the maritime trade obtained from "substantial, practical, commercial, nonlegal experience" through the conduct of maritime commerce rather than solely from the practice of admiralty law. *See Webster*, 32 F.3d at 668.

Significantly, both the *Pando* and *Webster* courts marked two distinctions that bear materially on the matter at hand. First, they differentiated between experience the arbitrator derives *solely* from the practice of law and that gained from actual commercial activity. More subtly, the courts suggest a difference between, on the one hand, the "status of 'commercial man'" which "attaches and remains" whether or not the person has retired from commerce or is still engaged in it. *Webster*, 32 F.3d at 668. On the other hand, the *Webster* court noted the particulars of the commercial experience—specifically the temporal order in which the arbitrator has acquired the non-legal experience. *See id.*

A third pattern is that which obtains in the case at hand. The Time Charters' arbitration clause contains two distinct requirements. Each arbitrator must be: (1) a commercial person and (2) knowledgeable in the operation and services of a specified segment of the shipping business—container vessels. In this case, however, for the purposes of this argument, the challenged arbitrator, while sufficiently qualified as a "commercial person" in matters related to maritime trade in general, is assumed to have become "knowledgeable" in commercial operations of the containership subset of the industry either primarily or entirely during the course of his law practice.

A fourth situation would prevail in a case entailing an arbitration clause demanding particularized qualifications, such as those specified in the Time Charters, and a challenged arbitrator who is a commercial person possessing general familiarity with the industry but lacking a more specialized knowledge of the specifically defined component of the industry. USSM's arguments suggest that the case at bar falls into this category. But the Court has rejected this view as not supported by the evidence on the record. Accordingly, the Court need not further consider the merits of this factual variation.

The fact pattern evidenced by the instant case poses questions not presented to nor squarely considered by the *Webster* court. First is whether, as USSM here maintains, the arbitrator's "status" as a

commercial person and the source of his relevant business experience actually must converge in time and place. Second is whether, conversely, once the arbitrator has acquired the necessary practical business experience, the status of commercial person "attaches" in general, and then "remains", *see id.* at 668, and effectively would then encompass particular knowledge of maritime customs and practices the arbitrator gained from the prior work as a lawyer, as well as from the personal pursuit of commercial familiarity and non-legal experience while in the practice of law but after regular business hours. Although the *Webster* court did not confront these issues directly, it addressed them tangentially, thus providing guidance germane to resolution of the matter at hand. The Second Circuit noted that

> [t]here is no good reason why one who spends his or her career as a practicing lawyer should be considered a commercial person the moment he or she withdraws from the practice and takes up a position in the maritime industry, while one who has spent his or her career on the commercial side of the industry and then takes up the practice should not.

*Id.* at 669. The practical commercial experience that a lawyer gains doing non-legal work in the industry "cannot be said to fall away the moment he assumes the mantle of practicing lawyer." *Id.* By the same token, whatever commercial knowledge and expertise, whether general or specialized, an attorney derives from practicing law does not "fall away" when the lawyer assumes the *status* of a "commercial person" by working in the trade. In fact, it is precisely that aspect of specialized familiarity and experience that often qualifies and enables lawyers to parlay the focused expertise so gained into a non-legal career in the particular industry.

In practice, USSM's reading of the arbitration clause at issue here would demand a two-stage process. First, it would require a temporal confluence of the arbitrators' commercial person status and the source of their relevant commercial experience. Second, it assumes a segmentation of the particular industry in order to identify the specific compartment of it from which the arbitrator's relevant knowledge is sufficiently acquired. This argument fails in this case for several reasons.

First, USSM's construction does not follow as either the only or as the most ordinary or compelling reading of the plain words of the Time Charters' arbitration provision. Linguistically, a formulation expressing that an arbitrator must be a "commercial person knowledgeable" in matters of a given industry does not of itself convey an inseparable temporal relation between the required commercial status of the individual and the particular trade source of his relevant business knowledge. Were such an interpretation the clear intent of the phrase, it would have been framed to state explicitly that the arbitrator be a commercial person whose knowledge of the specified trade matters has been acquired solely from contemporaneous practical experience in the particular industry. This reading loads into the meaning of the three words "commercial person knowledgeable" several requirements that demand assuming temporal leaps, filling substantive gaps and imposing relational conditions on the arbitrator's qualifications that do not flow manifestly from the plain words of the clause.

On its face, that phrase suggests a simpler construction, one not charged with suppositions not readily apparent from the text. The more evident reading of the clause holds that the arbitrator be eligible to serve if in fact he qualifies as a

"commercial person" by virtue of substantial practical experience acquired from non-legal work in the industry and if he also happens to be "knowledgeable" of the particular trade matters, regardless of whether the source of his commercial knowledge—so long as it is relevant and sufficient—comes from practicing as an attorney and related professional activities, or from substantial business experience.

Second, insofar as the latter interpretation of the arbitration provision's language is not only the plainer, but the one more consistent with the meaning of the words and less laden with implied terms, it is more likely to be both easier for potential arbitrators to apply and less likely to frustrate the parties' intent. And third, to this extent also, the more readily accessible reading is consistent with promoting the policy objectives of arbitration.

The Court's construction of the term "commercial person knowledgeable" offers a broader, unencumbered reading of the requirement that expands the arbitrator's qualifications to a larger universe of candidates. The larger field facilitates identifying those individuals eligible to be chosen as arbitrators. Of equal importance, the more common and inclusive view of the qualifications clause may facilitate self-selection by prospective arbitrators and, to that extent, minimize challenges to their credentials, thereby achieving speedier resolution of disputes.

█ Because an arbitrator's decision as to whether or not to disqualify himself "is better left to the discretion of the individual arbitrator" and that determination is not subject to judicial review until an award has been rendered and litigation over the eligibility of a panel member not only would undermine the objectives of arbitration, but would add to the cost of judicial resources. *See Florasynth,* 750 F.2d at 173, 177 ("[P]arties choose to arbitrate because they want quick and final resolution of their disputes.") In this regard, the Second Circuit's observation in *Florasynth,* made in the context of an untimely motion to vacate an award, is equally apt to the circumstances of the instant case. "The role of arbitration as a mechanism for speedy dispute resolution disfavors" an interpretation of an arbitration clause that encourages post-award challenges to the qualification of arbitrators. *Id.* at 177.

That is not to say, however, that in some situations particular parties would not find it desirable to narrow the scope of qualified arbitrators to an even more specialized group, limited, for example, as USSM here suggests, to commercial persons not only in and of the trade but who actually acquired their relevant practical experience solely from a more narrowly defined industrial niche. If indeed it actually represents the meaning the parties contemplate, then because this expression demands a more restrictive reading of contract terms and accordingly may constrain the public policy favoring swifter arbitration of commercial disputes, such parties should bear the burden and costs of unambiguously expressing their purpose in more explicit terms. Accordingly, the Court rejects USSM's objections to the Panel's award grounded on a challenge to Harper's qualifications.

### 2. *Disregard Of Law*

█ The second ground USSM asserts for vacating Maersk's arbitration award is that the Panel's decision was "rendered in manifest disregard of the law." (Pltf.'s Mem., at 19.) The "law" or public policy USSM asserts the Panel disregarded presumably is the statement of MARAD's view, as articulated in the MARAD Letter, concerning the parties' dispute over Article 33 of the Time Charters. USSM re-

peatedly characterizes the MARAD Letter as "the law" that the Panel ignored and as a "ruling" by MARAD "establishing what was required to preserve USSM's independence." (Pltf.'s Mem., at 20–21.) The Court disagrees with this characterization.

In *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir.1998), the Second Circuit defined "manifest disregard of law" to require:

> both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit and clearly applicable to the case.

*see also Dirussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir.1997) ("[T]he reach of the manifest disregard doctrine is 'severely limited'.") (citation omitted); *Webster*, 32 F.3d at 669 ("A court must not disturb an award simply because of an arguable difference of opinion regarding the meaning or applicability of the law").

Here, the MARAD Letter cannot properly be characterized as an official "ruling" or "governing legal principle", nor a "law . . . well defined, explicit, and clearly applicable" to this case. *Halligan*, 148 F.3d at 202. Nor, whatever the Letter's authority, can it be fairly said that the arbitrators ignored the position MARAD expressed, or indeed that it applied to the circumstances the facts here presented.

First, the MARAD Letter derived from an inquiry by USSM's General Counsel dated June 21, 2001, addressed to MARAD's Acting Deputy Maritime Administrator. That request asked for "MARAD's confirmation that USSM's interpretation of the financial reporting provisions of the Time Charters is correct and in compliance with U.S. citizenship requirements and the Operating Agreements." (Altman Aff., ¶ 12, Ex. 10 at 1.) The MARAD Let-

ter, dated June 27, 2001, came from the Acting Associate Administrator for National Security. (Altman Aff., ¶ 12, Ex. 11.) USSM has offered no evidence of what scope of authority these administrators had to issue official "rulings", "governing principles", "law" or legal interpretations on behalf of MARAD on a matter bearing significant legal, policy and commercial implications. *See e.g.* 46 C.F.R. § 501.5. From the sound of their titles (both "Acting") the two officials appear to be ranked in the hierarchy several echelons removed from the head of the agency and possessing interim authority. And neither was even a General Counsel arguably vested with duties that presumptively would encompass rendering authoritative interpretations of applicable laws or governing legal principles.

Second, USSM does not explain by what official process or procedure the MARAD Letter was elevated to the stature of a well-defined "law" or an official "ruling" of a governmental agency. On its face, the MARAD Letter does not reflect that it constituted the outcome of any public rule-making procedure subject to a recognized governmental process, nor even a considered formal decision engendered as the by-product of an adversarial administrative proceeding. Quite to the contrary, Maersk contends that it was not informed about the existence of USSM's June 21, 2001 letter or the MARAD Letter until the commencement of the parties' arbitration hearing on October 8, 2001. Thus Maersk was not accorded an opportunity to review USSM's letter or comment upon it. To this extent, the Court concurs with Maersk in observing that "the MARAD Letter was a response to [a] self-serving ex parte letter from USSM." (Maersk Mem. at 15.)

As a general matter, in a large government bureaucracy, a response to a unilateral inquiry that is prepared and returned

within less than one week from the date of the original communication is unlikely to reflect the product of an official "ruling" or an expression of a generally applicable public policy or legal principle. At best, it may represent the answering official's view of guidance for the correspondent in handling a private matter. Absent more evidence to the contrary, investing such correspondence with broader legal standing and public policy applicability could produce severe adverse consequences. Such a governmental response may be too easily and hastily procurable from a person with a large title and the color of authority, especially as a product of an informal, opaque process without safeguards that the communication expresses an official ruling and policy of the agency, rather than potential impropriety—the unwarranted influence of personal friendship, bias, collusion, or worse. While in no way implying that there is evidence of any such irregularity in the procurement of the MARAD Letter here, the Court is not persuaded that the Letter in fact may be regarded as an authoritative expression of a MARAD "ruling" or "law" embodying such protections to be accorded the status of official, generally applicable policy.

 Consistent with these concerns, and to ensure that what the "manifest disregard" standard requires the arbitrators to be ignoring or refusing to apply is indeed "law", the rule establishes "a high hurdle for the party seeking to vacate an arbitration award, requiring something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand and apply the law." *Duferco S.A. v. Ocean Wide Shipping Corp.*, No. 99 CV 2951, 2001 WL 804563, at *4 (S.D.N.Y. Apr.7, 2001) (internal quotations and citations omitted).

Fourth, the MARAD Letter cannot be construed as expressing an authoritative "ruling." By its own terms it purports to express an opinion interpreting the purpose of the language and application of Article 33 of the Time Charters, an agreement between two private parties.[5] To the extent the MARAD Letter appears to convey a position as to the parties' contractual intent, this endeavor appears questionable as a proper role for a government administrative agency, even if the agreement is subject to its approval. Moreover, the MARAD Letter expresses a view that the Time Charters' requirement of "annual financial statements" of USSM is inconsistent not only with the general purpose of Article 33 but with "the overall requirements of Section 2 [of the Shipping Act]". There can be no quarrel with the MARAD Letter insofar as it seeks to articulate the agency's interpretation of a statute or program it is charged with administering.

However, this Court cannot say that, given the circumstances surrounding the

---

5. The MARAD Letter states in pertinent part:

Although Article 33(b) of the Time Charters refers to the submission of "annual financial statements" of USSM, this language is inconsistent with the general purpose of Article 33 and the overall requirements of Section 2. First, Article 33 requires USSM to maintain true and correct records relating to Charter Hire, Drydocking Expenses, Supplemental Expenses, and all other records regarding the operation and management of the vessels. Second, Article 33 requires USSM to keep such records separate and apart from books and records relating to any other business of USSM. Finally, Article 33 requires USSM to submit reports relating to the operation of the vessels to [Maersk], and permit [Maersk] to inspect and audit USSM's books relating to vessel operating and management expenses. *The general purpose of Article 33 is to allow [Maersk] access only to financial information related to operation and management of the vessels, separate and part from all other financial information of USSM.* (Altman Aff., ¶ 10, Ex. 11 at 1.)

origin, authorship, appearance and timing of the MARAD Letter, the arbitrators could reasonably be faulted if they did not consider the Letter as "a governing legal principle" or "well defined, explicit and clearly applicable law." *Halligan,* 148 F.3d at 202. Nor can it be said under these conditions that they ignored or refused to apply such law. The Panel specifically acknowledged having reviewed the MARAD Letter. It stated that it was not persuaded that, as the Letter asserted, "release of the audited financial statements of USSM to [Maersk] violates MARAD regulations". (Final Award, at 13.) Moreover, the Panel declared that even if "furnishing the additional financials to [Maersk] would cause USSM to lose its Section 2 status, USSM's recourse, if any, would be to MARAD, not to this panel."

In this connection, the arbitrators expressed what, at worst, may be termed an "arguable difference of opinion regarding the meaning or applicability" of the view expressed in the MARAD Letter. *Webster,* 32 F.3d at 669; *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 934 (2d Cir.1986) ("We are not at liberty to set aside an arbitrations panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it.")

In fact, public policy underlying Section 2 would prevent the controlling interest in United States flagships to be exercised by or conferred upon foreign citizens or entities. *E.g.* 46 App. U.S.C. § 1187; Merchant Marine Act, Pub.L. No. 104–239, § 2, 110 Stat. 3118 (1996). There is no evidence here, as the Panel concluded, that furnishing the disputed information at issue would of itself result in Maersk attaining or exercising control of USSM. Indeed, as Maersk points out and the Panel acknowledged, Maersk already possessed most of the disputed information, which it had obtained from other sources, including publicly available documents. (*See* Final Award, at 13.) Thus, there is no evidence here that the Court's enforcement of the Time Charters as interpreted by the arbitrators in the Final Award would, as USSM contends, "violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." *United Paperworkers Int'l v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (internal citations and quotations omitted).

What is at issue here is not such clear and dominant "public policy", but rather "supposed" public interests that USSM asserts are expressed in a letter from a government agency expressing an opinion to a party engaged in what in the final analysis is merely a private contractual dispute. Indeed, the Panel's interpretation and enforcement of its award may very well place substantial USSM interests at risk. But that is not to say that any risk to USSM necessarily equates to a sufficient threat to public interests, or that giving effect to the Panel's contract reading would undermine a dominant public policy. Insofar as any actual public interest may be at stake, it could easily be vindicated by MARAD invoking Section 2 and revoking USSM's participation in the MSP if it formally finds a violation of the statute here. Whatever consequences such an action would have is a matter primarily implicating the private interests of USSM and Maersk. Accordingly, the Court declines to vacate the Panel's award on the basis of USSM's assertion that the ruling disregarded applicable law.

### ORDER

For the reasons discussed above, it is hereby

ORDERED that the motion of plaintiff U.S. Ship Management, Inc. to vacate the arbitration panel's Final Award dated October 19, 2001, is DENIED; and it is finally

ORDERED that the motion of defendant Maersk Line, Limited, to confirm the arbitration panel's Final Award dated October 19, 2001, and to dismiss the complaint herein is GRANTED.

The Clerk of Court is directed to dismiss the complaint and close this case.

SO ORDERED.